## Short Way Lines, Inc., et al. v. Sutton's Adm'r et al.

May 5, 1942.

R. W. Keenon and Ben D. Smith for appellants.

Duncan & Duncan for appellees.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

The appellants, Short Way Lines, Inc., and James Henson, have appealed from a judgment of $2,000 rendered against them in the Wayne circuit court in favor of the estate of Virgil Sutton, deceased, who was struck and killed by a motor bus owned by Short Way Lines and driven by James Henson. The action was brought by W. M. Sutton and Ina Sutton, co-administrator and administratrix of the estate of deceased. The grounds insisted on in brief of appellants for a reversal of the judgment are, (1) because the court erred in overruling defendants' motion for a directed verdict at the conclusion of plaintiffs' testimony and at the conclusion of all the testimony, and because the verdict is against the weight of the evidence; (2) because the court admitted incompetent testimony offered by the plaintiffs and refused to admit competent testimony offered by the defendants; (3) because the court erred in giving certain instructions and in refusing instructions offered by appellants; and (4) because of prejudicial remarks made by plaintiffs' counsel in his argument to the jury. We will discuss the points in the order named.

On the night preceding the accident the deceased had been out fox hunting and one of his dogs had become lost or strayed and on the day of the accident he went out for the purpose of finding the lost dog. He was accompanied by G. T. Flowers and Ed Brown, all of whom were traveling in an automobile belonging to and being driven by Flowers. Brown was in the front seat with Flowers and the deceased was in the rear seat. When they approached a point referred to in the record as the Dalton Farm and near or opposite a gate which led from the highway to the farm, they discovered a dog out in the field and they drove the automobile over to the right of the road and parked it with the right wheels off the black top and the left wheels approximately three feet on the black top. Brown got out of the automobile and went across the road to open the gate, presumably for the purpose of driving the car in-

to the field or the entrance, and left the deceased and Flowers in the automobile. Deceased had a fox horn and when he blew it the dog started running in the opposite direction and the deceased then got out of the car and stood near the left front fender or approximately in front of the car for a short period of time and blew the fox horn. Up to this point the evidence is not in dispute.

According to the evidence of Flowers, who remained in the car and saw the accident, after deceased blew his horn while standing in front of the left fender of the parked car, he then went to the center or near the center line of the road and stood there for half a minute or longer and blew the horn again, and all that time he was looking toward Brown or the dog in the field but never looked either to his right or left and when the bus was a short distance from deceased he then started "trotting" across the road in front of the bus and had crossed the center line when he was struck by the fender of the bus. Deceased was deaf, or practically so, and could not have heard the approaching bus. The bus came over the hill about one-tenth of a mile or approximately 500 feet from the point of the accident and the road was straight from the hilltop to the Flowers car, the place of the accident, and according to all the evidence there was nothing to obstruct the view of the driver of the bus. W. M. Sutton, administrator, and a son of the deceased, testified that he arrived at the scene of the accident a short time after it occurred, and after testifying to certain physical facts and observations made by him, which have no material bearing on the case, he further testified that on the day after the accident he had a conversation with Henson, the driver of the bus, in the presence of Ina Sutton, Ona Huddleston and Eula Wilson. He was asked to tell the jury the statements Mr. Henson made to him with reference to whether or not he saw the deceased. The question was objected to as to the bus company and the court admonished the jury that it would consider the answer only as to Mr. Henson and not as to the bus company. The witness then testified as follows:

"A. He was trying to explain the accident and he says: 'from the top of the hill I saw a man standing there with his hand up and I thought he was going to flag the bus to become a passenger, and as I kept driving on I thought he knew I had seen him

and wondered why he didn't stand back out of the way.'

"Q. Did he say where the man was? A. In the middle of the highway.

"Q. Did he say where the bus was when he saw him? A. From the top of the hill."

Ina Sutton, Ona Huddleston and Eula Wilson corroborated W. M. Sutton as to the statement made by Henson. Each of these witnesses testified, in substance, that Henson said that he saw the deceased standing near the middle of the road when he came over the hill and though he was flagging the bus and thought that deceased knew that he, Henson, saw him and wondered why he did not step back out of the way. Henson denied making these statements.

Henson testified that he saw the Flowers car when he came over the hill and that he blew the horn, but that he did not see the deceased until the bus was within 10 or 15 feet of the Flowers car and at that time the deceased suddenly appeared from in front of the Flowers car and trotted out to near the center of the road and he, Henson, turned to his left to go around the parked car and he then saw the deceased standing near the right fender of the Flowers car and he then "came trotting around in front of the left fender and he checked his speed and blew the horn and deceased threw up his hands and then started toward the opposite side of the road in front of the bus." Later he said the deceased momentarily stopped near the center line and threw up his hands "and took a little trot toward the gate and toward the bus and was looking toward the gate."

Henson was corroborated by the evidence of Brown who was on the opposite side of the road at the gate, and also by a number of passengers on the bus. According to the testimony of Henson, Brown and the passengers, the deceased did not emerge from in front of the Flowers car until the bus was within a few feet of the car and he then suddenly ran across the road in front of the bus, resulting in the accident. If the evidence of appellants' witnesses is to be believed the accident was brought about by the negligence of the deceased and was unavoidable as to the appellants. On the other hand, however, if the jury believed, and it had the right to so believe, that the deceased was standing at or near the center line of the

road when the bus came over the hill, a distance of approximately 500 feet, and that the driver of the bus saw, or by the exercise of ordinary care could have seen deceased at or near the center of the road and by the means at his hand could have avoided striking the deceased, in that event the evidence is sufficient to sustain the finding of the jury under the last clear chance doctrine, which was submitted to the jury by appropriate instructions. Cincinnati N. & C. Ry. Co. v. Renaker, 287 Ky. 388, 153 S. W. (2d) 906.

Appellants do not seriously contend that the testimony of Flowers is insufficient to take the case to the jury but for the fact that Flowers made a contradictory statement a few days after the accident. Flowers stated that a representative of the bus company, who was a stranger to him, talked to him about the accident and that he signed a statement. This statement is somewhat contradictory to the evidence of Flowers given before the jury. In some respects it tends to corroborate the evidence of Henson and other witnesses and is more favorable to defendants than to the plaintiffs. Flowers admitted that he made the statement, or a statement practically the same in substance. However that may be, the jury had the benefit of the previous statement made by Flowers and his testimony before the jury and had the right to give his evidence such weight and consideration it saw proper. It is not a province of the court to say as a matter of law that a witness' evidence should be entirely discarded because he may have made contradictory statements.

In addition to the positive evidence of the witness Flowers that deceased stood near the center line of the road for half a minute or longer before the approach of the bus, we also have the evidence of four witnesses who testified that Henson said he saw deceased standing near the center of the road when he came over the top of the hill and assumed that deceased was intending to board the bus as a passenger and as he approached deceased he did not step back or change his position, and further said that deceased was looking toward the gate. This was notice to Henson that deceased had not or might not have discovered the approaching bus. Henson admitted that he was driving the bus at a speed of about 30 or 35 miles an hour when he reached the top of the hill and upon discovering the Flowers car parked on

the side of the road he blew his horn at a distance of 500 feet away and slowed his speed to about 25 miles an hour but he did not give any further warning by sounding the horn until he saw the deceased approaching from in front of the Flowers car when the bus was only 15 or 20 feet from the car. In the circumstances it is doubtful that Henson exercised a proper degree of diligence and care in approaching the parked car, since its presence on the side of the road was notice or warning to him that someone might be about the car and in a place of danger.

Vol. 5 Am. Jr., page 606, refers to the case of Daughraty v. Tebbets, 122 Me. 397, 120 A. 354, 34 A. L. R. 1507, and the rule is thus stated:

"In an action to recover for the death of an automobilist who had stopped his car on the right-hand side of the highway, obtained a pail of water for his radiator, and was about to recross the road and return the empty pail when he was struck by defendant's car, which was traveling in the same direction, it was held that the operator of a car approaching a stationary car or team should be charged with the duty of observing whether any person or persons are connected with the standing vehicle, and should have his car or team under such control as to avoid an accident with any person or persons who may be around about such car or team, or who attempt to cross the road in front of the on-coming car, provided such person or persons are themselves in the exercise of due care."

See, also, to the same effect, 61 A. L. R. 1161. In the case of Gilbert's Adm'r v. Allen, 264 Ky. 202, 94 S. W. (2d) 341, 344, in discussing the sufficiency of warning given by the driver of an approaching vehicle, the rule is thus stated:

"The defendant testified that he, upon the occasion in evidence and as complying with this requirement of the statute to sound his horn in necessary warning of his approach, did twice sound it; first, when some 300 yards down the road, where he saw some one then crossing the highway, and again when only within some 15 to 25 feet of the deceased, after discovering his presence on the road just ahead of his truck.

"In view of defendant's admitted statement that he was then driving at the rate of 25 miles an hour, or, as testified by other witnesses, from 35 to 40 miles an hour, when so approaching the deceased, his claimed sounding of his horn, when within such distance, gave to deceased but a fraction of a second's notice of his running him down and it can hardly be considered that such a sounding of his horn by defendant, made under such conditions, served to give to deceased any real or reasonable warning of his imminent danger from the truck's approach. Certainly the blowing by defendant of his horn under such conditions fails to measure up to or meet the duty imposed upon the defendant driver by the statute, to sound his horn when necessary as a warning of his approach. Such a futile, vain, and belated warning, as it is shown was here given, was clearly insufficient to afford any opportunity or means of escape to the pedestrian, thus warned of the impending peril of injury from being struck by the approaching vehicle, nor can it be held to measure up to the duty imposed by the statute upon the driver of a vehicle, or truck, to blow his horn where found necessary for warning the threatened user of the highway."

We conclude, therefore, that under the proven facts and circumstances disclosed in the record, viewed in the light of the authorities supra, the evidence was sufficient to take the case to the jury and to sustain the verdict.

We now come to consideration of the court's ruling on the evidence. The alleged incompetent evidence is that W. M. Sutton was permitted to testify regarding a map "which was never introduced." We hardly understand what counsel means by saying that the map was not introduced unless it was because the map was not filed with or made a part of the record. It appears from the evidence that a map was presented and used on the trial of the case. This is made apparent by the following question and answer:

"Q. Examine this map and tell the jury whether or not that map fairly represents the place on the road; does that represent the place on the road? A. Yes, sir."

The witness was then permitted to point out on the map

where he saw blood. The introduction of the map was objected to by appellants but no reason therefor is shown in the record nor in the brief of appellants except that the map was not introduced. We cannot see wherein the use of the map was prejudicial to appellants, since the witness stated that the map fairly represented the road, and no evidence was offered to the contrary. Another complaint is that W. M. Sutton was permitted to testify that Flowers pointed out to him where the Flowers car was parked when the accident occurred and also permitted to testify that Flowers pointed out to him the position of decedent. All the evidence shows that the Flowers car was parked with the right wheels off the black top and the left wheels a few feet on the black top, and the position of the car as pointed out by the witness to Sutton does not contradict the evidence of any of the eye witnesses on that point and is in harmony therewith. Since there is no dispute about the location of the Flowers car we do not think the evidence complained of is prejudicial, conceding it was technically erroneous. Another complaint is that Sutton was permitted to testify as to whether a person standing at or near the center of the road at the place where the accident occurred could be seen from the top of the hill, a distance of approximately 500 feet. The witness testified that he placed a man near the center of the road where the accident occurred and went to the top of the hill and he could see the man standing in the road. Henson, the bus driver, said he saw the Flowers car parked by the side of the road but the road was clear and the deceased did not appear in the road until he was within 15 or 20 feet from the car, but he does not claim that he could not have seen deceased in the road when he, Henson, was at the top of the hill. It is common knowledge that any person with normal eyesight could see a man standing in the center of the highway at a distance of 500 feet. Since there is no contention that when the bus driver came over the top of the hill he could not have seen deceased if he had been standing in the road, we do not think the statement of the witness that he could see a man standing in the road at that distance could have been prejudicial.

W. M. Sutton had a picture of a man made whom he placed near the center of the road referred to above, and the court permitted the picture to be introduced in evidence, which appellants insist was erroneous because

Sutton placed the man at that location from information received from Flowers and hence it was hearsay evidence. Under some state of facts such evidence would be not only incompetent but prejudicial, but in the peculiar circumstances and facts of this case we do not think the introduction of the picture was prejudicial, even though technically erroneous, since the man protrayed in the picture is placed near the center line of the road in the exact location testified to by Flowers and at the place where Henson stated that deceased stopped "momentarily." The jury had the benefit of Flowers' testimony that deceased did stop at the point revealed in the picture and also heard the statement of Sutton that for the purpose of the picture he placed the man at the location testified to by Flowers. The picture reveals nothing new or contradictory to Flowers' evidence who gave Sutton the information as to the location of the deceased. We do not think that in these circumstances the introduction of the picture added any force to the evidence of Flowers. In its last analysis it meant nothing more than Sutton stating that Flowers said that deceased was standing at the point revealed by the picture, a fact which Flowers had already stated. And, furthermore, the purpose of the introduction of the picture was to show that Henson saw or by the exercise of ordinary care could have seen the deceased standing near the center line of the road when the bus was approximately 500 feet from the point of the accident, a fact already proven and not in dispute.

We now come to consideration of the complaint regarding the instructions. Instruction No. 1 reads:

"The Court instructs the jury that it was the duty of James Henson one of the defendants in charge of the bus referred to in the evidence, to keep a lookout ahead to discover the presence of persons on the highway, or so near thereto, so that they would likely come in contact with vehicles using said highway, and to exercise ordinary care in the operation of said bus to prevent injury to persons on the highway at the time and place mentioned in the evidence, and that duty included the keeping of said bus under reasonable control and driving same at a reasonable rate of speed, as you may believe from the evidence was reasonable and proper considering the condition of the highway and the

use thereof by other persons and vehicles at said time and place, and it was also the duty of said defendant in charge of said bus to give, when necessary, timely notice of the approach of said bus by sounding a horn; and if the jury shall believe from the evidence that the said James Henson failed to observe anyone or more of these duties and by reason thereof and as a direct and proximate result of such failure, if there was such a failure, the plaintiff's decedent, Virgil Sutton was struck and killed by said bus, then you will find for the plaintiff; but unless you so believe from the evidence you will find for the defendant.''

The criticism directed to the instructions is that there was no evidence that the driver of the bus did not have it under control, or that he was operating the bus at an excessive rate of speed, or that he failed to sound his horn. We hardly agree to this contention, since there is evidence to the effect that the driver of the bus approached the parked car at a speed of about 25 miles per hour, and according to Henson's own evidence he did not slacken the speed until he saw the deceased emerge from in front of the parked car when the bus was only 15 or 20 feet away. In the circumstances it was for the jury to determine whether or not such rate of speed was reasonable or that the driver had the bus under reasonable control when approaching the parked car. It is true that virtually all the evidence showed that Henson sounded the horn when he was at the top of the hill which, as pointed out above, was an unreasonable distance from the scene of the parked car and Henson admits that he did not sound the horn again until deceased appeared at or near the center of the road when it was too late to avoid the accident. This also was for the jury to determine whether Henson failed to exercise ordinary care by not sounding the horn within a reasonable distance of the parked car so that anyone who might be about the parked car or in a place of danger might be warned of the approaching bus.

By instruction No. 2 the court instructed the jury on contributory negligence of the deceased and also on what is known as the last clear chance doctrine. This instruction is the usual form and we think it is correct. Appellants do not seriously insist that it is incorrect, but only mildly criticize it.

Instruction No. 4 defines the term "ordinary care" as to both the appellants and the deceased. That instruction reads:

" 'Ordinary Care' as used in these instructions, in its application to the defendant, Henson, means that degree of care which a person of ordinary average prudence and skill engaged in driving a bus, usually exercise under circumstances like or similar to those proven in this case.

" 'Ordinary Care' as used in these instructions, in its application to the plaintiff's decedent, Sutton, means that degree of care usually exercised by ordinary prudent persons for his own safety under circumstances and conditions established in this case."

It is insisted that the court's definition of ordinary care in its application to the deceased is not in harmony with the facts and as a substitute therefor appellants offered this instruction:

"If you believe from the evidence that the hearing of plaintiff's decedent was impaired so as to prevent his hearing the approaching bus a reasonable distance away, then ordinary care as that term is applied to plaintiff's decedent, means that degree of care usually exercised by ordinary careful and prudent persons with such hearing as said decedent possessed under like or similar circumstances."

We think the definition of ordinary care as to the decedent as stated in instruction No. 4 embodied the same idea or principle as contained in the offered instruction, since it specifically told the jury that the term ordinary care in its application to the deceased means that degree of care usually exercised by ordinary persons for their own safety *under circumstances and conditions established in this case.* One of the circumstances and conditions established in the case was that the decedent's hearing was impaired to the extent perhaps that he did not hear the approaching bus. Under the instruction given the jury no doubt understood that it could take into consideration the fact that decedent was deaf or practically so, and therefore, it was incumbent upon deceased to exercise a greater degree of care in looking or watching for approaching vehicles than

would have been required had he a normal sense of hearing.

Appellants also offered this instruction:

"If you find for the plaintiff, you can find against one or both of the defendants, or you can find against one defendant in one amount and against the other in a different amount, or you can find a joint verdict against or for both defendants," which the court refused to give until after the case had been argued, and upon reconsideration the instruction was given to the jury. The complaint is that the refusal of the court to give the instruction before the case was argued deprived counsel for appellants of the opportunity to argue or explain this instruction to the jury. If counsel desired to argue and explain this instruction, it was his duty to ask the court to permit him to do so after the instruction was given, which he failed to do. We think it is now too late to complain of being deprived of a right which might have been granted, if asked, and failure to ask such right constituted a waiver thereof. Certain other minor criticisms are directed to the instructions given and also to the refusal of the court to give certain other offered instructions, but since we have examined the instructions given and the ones offered and rejected and have concluded that the instructions given were correct under the proven facts and circumstances of the case, it becomes unnecessary to extend this opinion by further discussion of the instructions.

It is also insisted that counsel for appellees made prejudicial remarks to the jury. In the concluding argument appellees' counsel said:

"You will return a verdict in such a sum as will compensate them for the loss of Mr. Sutton, their father. No power on earth can return Virgil Sutton to his family."

It is argued for appellants that the last sentence in the above quoted statement was made for the purpose of prejudicing the minds of the jury. An objection was made to the statement and the court admonished the jury to consider the evidence but failed to rule further on the objection, to which counsel excepted. We do not think, however, that the statement of counsel could have prejudiced or inflamed the minds of the jury, since no doubt they already understood and knew that deceased

could not be returned to his family and that the province or duties of the jury went no further than to find in favor of the estate of the deceased within the limits set out in the instructions. The fact that the jury found only the sum of $2,000 for the estate of the deceased, who was 67 years of age, in good health and earning about $500 a year, does not indicate that they were prejudiced or unduly influenced.

Finding no error prejudicial to the substantial rights of appellants, the judgment is affirmed.